# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON TRAVIS UHL,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 1:13-cv-01303-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff Jason Travis Uhl, by his attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II and for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, U.S. Magistrate Judge.

The sole issue in this case is whether the Administrative Law Judge (ALJ) appropriately applied the provisions of SSR 13-2p to determine that Plaintiff would not be disabled but for his drug and alcohol abuse. Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based on proper legal standards.

///

I.   **Procedural History**

On September 23, 2009, Plaintiff filed applications for disability insurance benefits and for supplemental security income. Plaintiff alleged disability beginning December 18, 2007. The Commissioner initially denied the claims on May 6, 2010, and upon reconsideration, on October 22, 2010. On December 20, 2010, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on February 9, 2012. Jose L. Chaparro, an impartial vocational expert, also appeared and testified.

On March 9, 2012, Administrative Law Judge Christopher Larsen denied Plaintiff's application. The Appeals Council denied review on May 21, 2013. On August 16, 2013, Plaintiff filed a complaint seeking this Court's review.

II.   **Factual Summary of Administrative Record**

**Plaintiff's testimony.**  At the time of the administrative hearing, Plaintiff (born October 14, 1977) lived with his mother and brother after living in his car for a year. He had become homeless after being arrested for domestic violence. Plaintiff spent his days visiting his girlfriend or running errands for his mother. He had not worked in more than six years.

Before attending Lemoore High School, Plaintiff attended special classes since he had difficulty concentrating, following directions, and getting along with others. He completed twelfth grade and subsequent training for a class A truck driver's license. From 2002 to 2004, he drove a beverage delivery truck, unloading alcoholic beverages weighing up to fifty pounds. He was fired from this job for mouthing off. He had retained the license but had let endorsements and his medical qualification lapse.

Plaintiff last worked for a temporary service, doing simple welding and working on production lines in chemical plants. He lost the job after fighting with a co-worker. Thereafter, he remained at home, caring for their two daughters while his partner worked. Plaintiff had also worked as a laborer and in construction. He thought he could do just about any job, depending on who he had to work with.

Plaintiff testified that he could not tolerate a co-worker with an attitude, and his mouth often got him into trouble:

> I won't put up with anybody's BS, man.  If I don't like what you have to say, I'm going to tell you what I think.  If I don't like you, I'm going to let you know.  I don't have to put up with anybody's crap.  I don't feel I have to.  I put up with it most of my life.  I'm too old to put up with anybody's crap.

AR 44.

Plaintiff also testified that he had never been able to support himself but did not understand why.

Following a 2009 domestic violence conviction,[1] Plaintiff spent two weeks in jail, then participated in a year-long rehabilitation program.

Plaintiff was seeing a psychiatrist because his mother told him that he needed to.  He had ADD and a short attention span, was easily irritated, and had difficulty understanding things.  When Plaintiff was irritated, he became verbally aggressive.  Because Plaintiff had no insurance or income, his mother paid for his psychiatric treatment out of pocket.

Although Plaintiff reported difficulty concentrating, he enjoyed watching movies and television, and playing video games for up to two hours with only a break to smoke or use the restroom.  He could maintain his own personal hygiene.  Although he was able to cook, Plaintiff was living at home where his mother did the cooking for the family.  He helped clean the house, including his own room.  He took care of his two daughters when they visited him.

Plaintiff had used marijuana since he was ten years old and considered it helpful in keeping his emotions level.  He disagreed with his doctor, who thought all drugs were bad for him, including marijuana.  Plaintiff also used methamphetamine "once or twice every couple of months," but did not use alcohol.  AR 63.  Asked if he had ever had periods when he was not using drugs, Plaintiff replied that he had not smoked marijuana for the last two days.  He candidly admitted that he liked being stoned and thought being sober was boring.

///

---

[1] Dr. Bonilla's case history indicated that this was Plaintiff's third domestic violence conviction.

In an adult function report dated January 22, 2010, prepared by Plaintiff and his mother, Plaintiff reported that he was taking Depakote, which made it difficult for him to wake up after normal amounts of sleep. Following recent hand surgery, he was living in his car and having difficulty performing personal care. He was suffering from depression and isolating himself. He thought that people perceived him as angry and violent. He could not maintain attention for more than a few minutes. Plaintiff, who had recently been suicidal, was enrolled in an intensive outpatient psychiatric treatment program.

Plaintiff's uncle, Jim Fugate, prepared a third-party adult function report dated January 26, 2010, responding with answers that were substantially similar to those provided in Plaintiff's own report.

**Medical reports.** After an appointment with Plaintiff on September 22, 2009, Sreekanth Chava, M.D., reported that Plaintiff had a history of intermittent depression beginning at age fifteen or sixteen as well as a history of superficial cutting. As a teenager, he received individual therapy and medication management at Kings County Mental Health Center. Plaintiff had a long history of substance abuse, including nicotine, alcohol, marijuana, benzodiazepines, methamphetamine, cocaine/crack, and energy pills. Although he had been sober for two to three weeks, he was then using nicotine, alcohol (12-18 beers per weekend), marijuana daily, benzodiazepines occasionally, cocaine/crack periodically, and energy pills daily.

Dr. Chava noted that in late August 2009, after drinking alcohol, smoking cannabis, and taking Xanax, Plaintiff and his partner of nine years had an altercation that resulted in Plaintiff's being charged with domestic violence and jailed for two weeks. He was on three years' probation. Because his partner had secured a restraining order, Plaintiff was at risk of becoming homeless. He complained of depressed mood, significant appetite change, decreased energy, guilt, hopelessness, decreased concentration, recurrent thoughts of death, feeling overwhelmed, and frequent mood swings.

4

Dr. Chava found Plaintiff fully oriented with attention and concentration within normal limits, memory intact, and fund of knowledge age appropriate. His impulse control was fair but insight and judgment were limited. He reported vague suicidal thoughts. Dr. Chava diagnosed:

> Axis I:   Polysubstance abuse, Adjustment Disorder with depressed mood, R/O MDD recurrent, R/O Substance induced mood disorder
> Axis II:  Cluster B traits [2]
> Axis III: Patient Active Problem List[3]
> Axis IV:  problems with relationships, housing problems and economic problems
> Axis V:   51-60 moderate problems.

AR 285.

Dr. Chava referred Plaintiff to Kaiser's chemical dependency service (CDRP) and the intensive outpatient psychiatric program.

On October 2, 2009, Plaintiff saw Burke Joseph Bonilla, M.D., the psychiatrist associated with CDRP. Reporting chronic suicidal ideation, Plaintiff intended to kill himself if his wife ended their relationship. He complained of chronic mood instability with accompanying anger, depression, and anxiety. Plaintiff reported that he had been addicted to methamphetamine until he was arrested in 2004 and attended a rehabilitation program. He abused his wife's Xanax and his sister's Zoloft.

On September 28, 2009, psychologist Laura A. Lencioni, Psy.D., summarized her session with Plaintiff, following Dr. Chava's referral to the intensive outpatient program. Plaintiff had been sober since September 3. He hoped to reconcile with his family but his partner had secured a restraining order and sought full custody of their children. Plaintiff expected that he would be unable to participate in CDRP since he was about to lose his Kaiser coverage, which was a benefit of his partner's employment. Plaintiff, who felt that he had hit bottom and lost everything, was motivated to change his behavior.

///

---

[2] Persons with Cluster B personality disorder show patterns of behavior most would regard as dramatic, emotional, or erratic. Cluster B includes antisocial, borderline, histrionic, and narcissistic personality disorders. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).

[3] Axis III generally reflects a patient's current physical ailments. Plaintiff's "active problem list" at Kaiser Permanente consisted of his continued positive reaction to TB tests, after having been treated for tuberculosis as a child.

Dr. Lencioni's mental status evaluation indicated that Plaintiff was healthy, appropriately dressed, pleasant, cooperative, and fully oriented. Attention and concentration were within normal limits. Short- and long-term memory were intact, although Plaintiff reported long-term memory problems which he attributed to his childhood use of Ritalin. Plaintiff was depressed, fidgety, dysphoric, and anxious with restricted affect. Impulse control, insight, and judgment were marginal and poor.

Plaintiff again saw Dr. Bonilla on October 2, 2009. Dr. Bonilla attributed Plaintiff's job problems, including conflicts with co-workers and supervisors, working under the influence, and use of bad language, to his substance abuse. Although Plaintiff did not feel different after taking Wellbutrin, others had commented about his changed demeanor.

On October 6, 2009, psychiatric social worker Xia Yeng Vu, LCSW, described Plaintiff as "getting worse." Vu noted that Plaintiff was struggling with the concept of abstinence from drugs and alcohol, relapse warning signs and triggers, cross addiction, and the need for support in recovery. Plaintiff denied that marijuana was addicting. He was not attending daily support group meetings outside the CDRP program as he had agreed to do. Plaintiff reported having drunk hard liquor and a six-pack of beer the night before because he was irritable and wanted to release his emotions. "It's not the alcohol I'm worried about," said Plaintiff, "I can just drink occasionally, it's the drugs I'm worried about." AR 417.

Kevin Dow Gong, M.F.T, conducted dialectical behavior therapy (DBT) sessions with Plaintiff on October 20 and 30, and November 5, 2009. Plaintiff complained of feeling angry and violent; experiencing depression (including depressed mood, anhedonia, crying spells. significant appetite change, insomnia, irritability, agitation, decreased energy, guilt, and decreased concentration); abusing multiple substances; and experiencing trauma (including recurrent memories and thoughts; distressing dreams, and psychic numbing). He planned to participate in counseling and CDRP until his insurance expired at the end of the calendar year. Gong observed Plaintiff to be oriented and

6

responsive in conversation, with intact focus and concentration, although he appeared depressed and sad and was somewhat disheveled.

On November 16, 2009, John Geren Nichols, M.D., performed surgery to release Plaintiff's left carpal tunnel.

On November 17, 2009, Plaintiff cancelled his appointment with Gong, explaining that he had surgery and was unable to drive while taking pain medication. The same day, he called Dr. Lencioni and reported feeling suicidal. He was in pain following surgery, and his wife had told him she no longer wanted a relationship. Plaintiff was self-destructive, using marijuana and alcohol, and cutting himself. In a November 18 session with Dr. Bonilla, Plaintiff reported suicidal ideation, thoughts of hurting his wife, and urges to take his anger at his wife out on their children. These feelings disturbed Plaintiff, who did not want to act on them.

On December 15, 2009, Plaintiff returned to Dr. Gong, who observed that Plaintiff was depressed, but not in crisis. Plaintiff missed his December 24 appointment with Dr. Gong. Although by January, Plaintiff had lost his insurance coverage and cancelled his pending appointments at Kaiser, psychiatrist Marta Beatriz Obler, M.D., saw him on an urgent basis in January 15, 2010. Plaintiff, who had become homeless, reported that his depression had worsened and that he was periodically experiencing suicidal thoughts. He had used amphetamines two weeks previously, followed by marijuana to calm himself down. He had stopped taking Depakote, which he felt increased his depression and suicidal feelings. Dr. Obler discontinued the Depakote prescription, substituting Celexa and Seroquel. Plaintiff declined her offer of hospitalization.

By the time Plaintiff saw Gong on January 19, 2010, his mood modulation, focus, and control were improving. He was concerned about the need to stop smoking marijuana to optimize the effect of his prescription medication. Although Gong planned to see Plaintiff weekly until he was more stabilized, Plaintiff did not show for his next appointment (January 27).

///

On January 19, 2010, psychologist Steven C. Swanson, Ph.D., prepared a consultative psychological assessment of Plaintiff, in which he opined:

> [Plaintiff] is a 32-year-old man referred for psychological assessment to assist with determination of eligibility for Social Security Disability Income (SSI). At a young age, he started using street drugs. He has a lengthy polysubstance addiction history. He continues to smoke marijuana and takes narcotic/opioid pain-killing medication. Until recent months, he used cocaine, methamphetamine, and alcohol heavily. He has twice been in jail and is on probation. He has worked as a warehouse worker, cashier, welder, and truck driver but has not worked in recent years and is presently unemployed. He has never been hospitalized in a psychiatric setting and there is no indication of gross psychopathological disturbance. His intelligence was assessed and found to be in the Low Average range. He describes having been a slow learner and having attended regular and Special Education classes before graduating from high school.
>
> [Plaintiff] is judged able to maintain concentration or relate appropriately to others in a job setting. He would be able to handle funds in his own best interests. He is expected to understand, carry out, and remember simple instructions. He is judged as able to respond appropriately to usual work situations, such as attendance, safety, and the like. Changes in routine would not be very problematic for him. Difficulties in maintaining social relationships do not appear to be present.
>
> has [*sic*] the ability to understand and respond to increasingly complex requests, instructions, or questions in an age-appropriate manner. He appears to have the ability to communicate by understanding, initiating, and using language in an age-appropriate manner. He appears to have the ability to socially integrate with peers and adults in a mostly age-appropriate fashion. He appears to have the ability to respond to stimuli in a mostly age-appropriate manner. He seems to be able to engage in and sustain an activity for a period of time. He appears to be able to engage in this activity at a pace that is mostly appropriate for his age.

AR 272.

Psychologist Paul Klein, Psy.D., prepared a mental residual functional capacity assessment dated February 17, 2010. Dr. Klein generally found Plaintiff to be not significantly limited in the various listed categories of psychological functioning except that he found moderate limitations in Plaintiff's ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  In the associated psychiatric review technique, Dr. Klein opined that Plaintiff had no repeated episodes of decompensation; mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.

When Plaintiff saw Dr. Bonilla on March 1, 2010, he reported that he was doing better.  But he was again consistently using marijuana and methamphetamines.  Plaintiff used Celexa on the days he was not abusing methamphetamines or marijuana and reported that it helped to reduce his depression and anger.  Plaintiff denied Dr. Bonilla's suggestion that he return to CDRP.  Dr. Bonilla threatened to discontinue Plaintiff's prescriptions if he continued to use methamphetamine and marijuana.  Dr. Bonilla diagnosed:

> Axis I:   Polysubstance Dependence.  Depressive D/O NOS.
> Axis II:  BPD[4]
> Axis III: Carpal tunnel
> Axis IV:  legal, financial, marital, family
> Axis V:   55-60

AR 344.

Orthopedist Theodore Georgis, Jr., M.D., performed an orthopedic consultation for the agency dated March 30, 2010.  Dr. Georgis diagnosed bilateral carpal tunnel syndrome, status post left carpal tunnel release.  In his opinion, Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk six hours of an eight-hour work day; and sit without restriction.

///

///

---

[4] The record includes multiple references to Plaintiff's diagnosis of "BPD," as well as references to both bipolar disorder and borderline personality disorder.  Whether the references were intended to refer to one diagnosis or to alternative diagnoses is unclear.

Following a session with Plaintiff on April 8, 2010, Gong reported that Plaintiff exhibited moderate levels of depression. He was using marijuana instead of Celexa "since I ran out and Dr. Bonilla has not refilled it." AR 351.

On April 26, 2010, L. Bobbit, M.D., prepared a physical residual functional capacity assessment. Dr. Bobbit opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, or walk about six hours in an eight-hour work day; had unlimited ability to push and pull; could only occasionally crawl or climb ladders, ropes, or scaffolds; and was capable of limited handling and fingering. Although Petitioner's symptoms had improved with carpal tunnel release surgery,[5] he still experienced symptoms on the right side.

On October 21, 2010, H. Biala, M.D., completed a mental residual functional capacity assessment in which he concluded that Plaintiff was not significantly limited in any categories except the ability to understand and remember detailed instructions and the ability to carry out detailed instructions, in which he was moderately limited. In the associated psychiatric review technique, Dr. Biala determined that Plaintiff had an affective disorder, a personality disorder, and substance addiction disorders (alcohol abuse and polysubstance disorder). He opined that Plaintiff had no repeated episodes of decompensation; mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.

On July 27, 2011, Stephen Griffith, M.D., completed a mental residual functional capacity questionnaire for Calpers Dependent Disability Benefits. Dr. Griffith opined that Plaintiff was seriously limited, but not precluded, from remembering work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining attention for two hour segment; making simple work-related decisions; adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places; and using public transportation.

---

[5] The report does not explicitly acknowledge that Plaintiff had release surgery only on the left.

Plaintiff was unable to meet competitive standards of maintaining regular attendance and punctuality within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; responding appropriately to changes in a routine work setting; being aware of normal hazards and taking appropriate precautions; understanding and remembering detailed instructions; and carrying out detailed instructions.  Plaintiff had "no useful ability to function" in working in coordination with or proximity to others without being unduly distracted; completing a normal workday or workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; dealing with normal work stress; setting realistic goals or making plans independently of others; dealing with the stress or semiskilled or skilled work; interacting appropriately with the public; and maintaining socially appropriate behavior.  In Dr. Griffith's opinion, Plaintiff would be absent from work more than four days monthly.  He diagnosed Plaintiff:

```
Axis I:    296.9 [Mood Disorder NOS]; 304.80 [Polysubstance Dependence]
Axis II:   301.83 [Borderline Personality Disorder]
Axis III:  none known
Axis IV:   problems with support group, financial, employment
Axis V:    50
```

AR 399.

Dr. Griffith opined that Plaintiff's primary dysfunction was "his labile, irritable and angry mood," which "prevents him from being able to tolerate the normal stresses of interpersonal engagement."  AR 401.  Dr. Griffith's opinion was effective beginning May 26, 2010, when Plaintiff began treatment at his clinic.

Although Dr. Griffith reported that he had treated Plaintiff beginning May 26, 2010, the record only includes treatment notes for Plaintiff's sessions with Dr. Griffith on August 22, October 3, and November 14, 2011.  In August and November, but not October, Dr. Griffith observed no problems

11

with concentration or memory.  In October, Plaintiff disclosed some use of methamphetamines.  Dr. Griffith prescribed Abilify, Wellbutrin, Celexa, and clonazepam.

**Vocational expert testimony.**  Vocational expert Jose Chaparro categorized Plaintiff's past work as production line welder, DOT No. 819.684.010, and conveyer feeder-off bearer, DOT No. 921.686-014.  Both jobs are classified as medium, unskilled, SVP 2.  Other past work identified in Plaintiff's documentation included mail clerk (DOT No. 209.687-026, light, unskilled); cashier-checker (DOT No. 211.462-014, light, semi-skilled, SVP 3); exterminator (DOT No. 389.684-010, light, skilled, SVP 5); carpenter (DOT No. 860.381-022, medium, skilled, SVP 5[6]); construction worker II (DOT No. 869.687-026, very heavy, unskilled); heavy truck driver (DOT No. 905.663-014, medium, semi-skilled, SVP 4); and stores laborer (DOT No. 922.687-058, medium, unskilled).

For the first hypothetical question, the ALJ directed Chaparro to assume a hypothetical person of the same age, education, and work experience as Plaintiff, who could perform the full range of light physical exertion but was limited to performing simple, repetitive tasks. Salvo opined that the hypothetical person could perform Plaintiff's past work as a mail clerk.  The hypothetical person could also perform the work of Cashier II (DOT No. 211.462-010, light, unskilled, 1,697,000 jobs nationally and 174,000 jobs in California); fast foods worker (DOT No. 311.472-010, light, unskilled, 2,000,000 jobs nationally, 200,000 jobs in California); housekeeper cleaner (DOT No. 323.687-014, light, unskilled, 218,000 jobs nationally, 23,000 jobs in California).

For the second hypothetical question, the ALJ directed Salvo to assume the hypothetical person described in the first hypothetical who was also unable to tolerate public contact.  Chaparro opined that the second hypothetical person could not perform the jobs of cashier II or fast foods worker, but could work as a mail clerk or housekeeper cleaner.  The second hypothetical person could also work in any of thirty DOT job titles as a sewing machine operator (light, unskilled, 71,000 jobs nationally, 16,000 jobs in California), specifically including lockstitch hemmer (DOT

---

[6] Chaparro estimated the SVP equivalency level based on Plaintiff's limited tenure of eight months in this job.

No. 786.682-134), or as a can filling and closing machine tender (DOT No. 529.685-282, light, unskilled, 25,700 jobs nationally, 3400 jobs in California).

For the third hypothetical question, the ALJ directed Chaparro to assume a hypothetical person of the same age, education, and work background as Plaintiff, who, regardless of physical limitations, would be off-task more than 25 percent of the time. Chaparro opined that no work would be available for such a person.

For the fourth hypothetical person, Plaintiff's attorney directed Chaparro to assume the first hypothetical person, who was also unable to interact with the public, supervisors, or coworkers. Chaparro opined that no work would be available for such a person.

## III.     Discussion

### A.     Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

///

### B. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. See 42 U.S.C. § 423(d)(2)(A); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Id.*

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520; 416.920. The process requires consideration of the following questions:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995). If a claimant is found "disabled" or "not disabled" at any step, the remaining steps need not be addressed. *Tackett*, 180 F.3d at 1098.

At steps one through four, claimants bear the burden of proof subject to the presumed nonadversarial nature of Social Security hearings and the Commissioner's affirmative duty to assist claimants in developing the record whether or not they are represented by counsel. *Tackett*, 180 F.3d at 1098 n. 3; *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). If the first four steps are adequately proven, at step five, the burden shifts to the Commissioner to prove that considering the

claimant's residual functional capacity, age, education, and work experience, he or she can perform other work that is available in significant numbers. *Tackett*, 180 F.3d at 1098; *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

If alcohol or drug addiction is "a contributing factor to the Commissioner's determination that an individual is disabled," however, the claimant is not eligible to receive disability benefits. 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. §§ 404.1535(a), 416.935(a). If the ALJ's first analysis has found the claimant to be disabled and the record includes medical evidence of drug or alcohol addiction, the burden shifts back to the claimant to prove that his or her drug or alcohol addiction is not a contributing factor material to his or her disability. *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007). The ALJ must then conduct a drug and alcohol analysis ("DAA analysis") to determine whether the claimant would remain disabled if he or she stopped using drugs or alcohol or both. *Id.* at 747. If the claimant would be disabled even if he or she was not addicted to drugs or alcohol or both, his or her addiction is not material to the disability determination. *Id.* at 747. If the remaining severe impairments would not be disabling, the claimant's addiction is material to the determination, and the Commissioner must deny benefits. *Id.*

In the first phase of the analysis in this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 18, 2007. His severe impairments were bilateral carpal tunnel syndrome( status post left carpal tunnel release), depressive disorder, personality disorder, and polysubstance abuse. None of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1 (20 C.F.R. §§ 404.1520(d) and 416.920(d)). Considering all of his severe impairments, Plaintiff was unable to perform any past relevant work or any jobs that exist in significant numbers in the national economy.

The ALJ then proceeded to perform the DAA analysis. He concluded that even if Plaintiff stopped abusing substances, his remaining limitations would cause more than a minimal impact on his ability to perform basic work activities, so that he would still have a severe impairment or combination of impairments. None of these remaining impairments alone or in any combination would meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P,

1  Appx. 1 (20 C.F.R. §§ 404.1520(d) and 416.920(d)). If Plaintiff ceased substance abuse, he would be
2  able to perform his past relevant work as a mail clerk.

3  Because Plaintiff would not be disabled if he stopped substance use, his substance abuse was
4  material to the determination of disability. Accordingly, the ALJ concluded that Plaintiff was not
5  under a disability.

### C. **Materiality of Plaintiff's Polysubstance Dependence**

Plaintiff objects to the ALJ's determination that his drug abuse and alcoholism (DAA) is material. The ALJ, contends Plaintiff, offered only a bare conclusion that he would not be disabled if he were not abusing drugs, which "does not constitute substantial evidence because there is no evidence of [Plaintiff's] ability absent polysubstance abuse." Doc. 18 at 11. Accordingly, Plaintiff asks this Court to reverse and remand for payment of benefits or for proper analysis.

In response, the Commissioner argues that Plaintiff's testimony (that he reduced his methamphetamine usage and stopped abusing alcohol and other drugs and that he had an ability to maintain attention longer than the limited times observed by Dr. Griffith) illustrated the differences in Plaintiff's functioning when he was largely sober and when he had relapsed into drug abuse. The differences between Petitioner's functioning during the brief period of sobriety in Fall 2009 and during his subsequent relapse into drug abuse further illustrate that Plaintiff's drug abuse was a material factor in the combined disability finding.

In making his argument, Plaintiff contends that the ALJ erred in relying on the reports of Dr. Griffith when considering DAA (*see* AR 21) and on the reports of Dr. Swanson when evaluating Plaintiff's limitations in the absence of DAA (*see* AR 24-25) since both doctors addressed the period in which Plaintiff was using drugs and alcohol. The Court agrees. Neither Dr. Griffith nor Dr. Swanson projected Plaintiff's residual functional capacity in the absence of DAA. In fact, no medical evidence whatsoever addressed that issue.

Instead of acknowledging Plaintiff's failure of proof, the ALJ artificially separated his discussions of Dr. Griffith's and Dr. Swanson's reports, as if Dr. Griffith's opinion addressed Plaintiff's residual functional capacity in the presence of all severe impairments and Dr. Swanson's opinion addressed Plaintiff's residual functional capacity considering all impairments except DAA.

16

He buttressed his conclusion that Plaintiff's DAA was material by contrasting Plaintiff's claimed abilities with his actual activities of daily living.

All of the documentary evidence addressed only Plaintiff's functioning in the presence of both DAA and his other mental health impairments.  Although the ALJ contrasted Plaintiff's actual life activities with his claimed lack of function, he neither concluded that Plaintiff was "largely sober" when he testified at the hearing nor concluded that Plaintiff's functioning had improved through complete sobriety.  Accordingly, the Court finds the Commissioner's argument to that effect unpersuasive.  Although the Court disagrees with Plaintiff's argument that the lack of evidence mandates remand of this case, it agrees that the issue to be resolved is the appropriate disposition of Plaintiff's claim in light of the absence of proof of the materiality of Plaintiff's drug and alcohol addiction.

The ALJ's error is more easily understood if considered within the framework of DAA analysis set forth in Social Security Ruling (SSR) 13-2p, which requires the ALJ to address the following six steps:

1. Does the claimant have DAA?
2. Is the claimant disabled considering all impairments, including DAA?
3. Is DAA the only impairment?
4. Is the other impairment(s) disabling by itself while the claimant is dependent upon or abusing drugs or alcohol?
5. Does the DAA cause or affect the claimant's medically determinable impairment(s)?
6. Would the other impairment(s) improve to the point of disability in the absence of DAA?

SSR 13-2p.

Because Plaintiff presented no evidence regarding the interaction of his drug and alcohol addiction with his depressive and personality disorders, the ALJ had no evidentiary basis from which to draw a deeper or more reasoned discussion of the fourth through sixth steps of the DAA analysis.

17

Nonetheless, the proper remedy is not to remand the case either for payment of benefits or to afford Plaintiff another opportunity to present the previously omitted proofs.

"At all times, the burden is on the claimant to establish [his] entitlement to disability benefits." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). *See also Parra*, 481 F.3d at 748 ("[T]he claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material to his disability"). "[P]lacing the burden on the claimant is practical because the claimant 'is the party best suited to demonstrate whether [he] would still be disabled in the absence of drug or alcohol addiction.'" *Parra*, 481 F.3d at 748 (quoting *Brown v. Apfel*, 192 F.3d 492, 298 (9th Cir. 1998)). In addition, Congress intended 42 U.S.C. §423(d)(2)(C) "to discourage alcohol and drug abuse, or at least not to encourage it with a permanent government subsidy." *Ball v. Massanari*, 254 F.3d 817, 824 (9th Cir. 2001). When a plaintiff fails to carry his burden of proving that his drug or alcohol addiction is not a contributing factor material to his disability, an ALJ's denial of benefits under 42 U.S.C. § 423(d)(2)(C) "is supported by substantial evidence and free of material error." *Parra*, 481 F.3d at 750.

Whether Plaintiff contends that the ALJ erred in failing to act independently to develop the record concerning Plaintiff's drug and alcohol addiction is not clear. In any event, that argument cannot prevail. "An ALJ's duty to develop the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). That principle cannot be applied to shift the claimant's burden of proving disability to the Commissioner. *Id.* at 459. Nor can the ALJ's duty to develop the record shift to the ALJ the burden of proving that a claimant's drug or alcohol addiction "is not a contributing material factor to his disability." *See Parra*, 481 F.3d at 748 ("An alcoholic claimant who presents inconclusive evidence of materiality has no incentive to stop drinking, because abstinence may resolve his disabling limitations and cause his claim to be rejected or his benefits terminated. His claim would be guaranteed only as long as his substance abuse continues—

18

a scheme that effectively subsidizes substance abuse in contravention of the statute's purpose."). Thus, to the extent that Plaintiff is arguing that the ALJ had a duty to develop the record regarding the materiality of Plaintiff's drug and alcohol addiction, he cannot prevail.

This leaves the Court with the hearing decision's inartful attempt to resolve the DAA analysis through creative interpretation of medical opinion. Why the ALJ employed this unusual analysis instead of directly addressing Plaintiff's failure to carry his burden of proof is unclear. Nonetheless, because Plaintiff himself concedes that "there is no evidence of [Plaintiff's] ability absent polysubstance abuse" (Doc. 18 at 11), this Court finds the error to be harmless.

In general, an ALJ's error is harmless when it is "inconsequential to the ultimate disability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). To determine whether the error was harmless, a court must look to the record as a whole to determine whether the error alters the case's outcome. *Id.* It does not do so here. Plaintiff's having failed to bear his burden of proof regarding the materiality of his drug and alcohol addiction, the outcome of the case is certain: in the absence of his drug and alcohol addiction, Plaintiff is not disabled.

## IV.     Conclusion and Order

Because Plaintiff concedes that he failed to carry his burden of proving that his drug or alcohol addiction is not a contributing factor material to his disability, the ALJ's denial of benefits under 42 U.S.C. § 423(d)(2)(C) "is supported by substantial evidence and free of material error." *Parra*, 481 F.3d at 750. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 18, 2015**                         /s/ Sandra M. Snyder
                                                   UNITED STATES MAGISTRATE JUDGE